„!LANDRIEU, Judge.
Plaintiff Harvey J. Morgan appeals from a trial court judgment dismissing his medical malpractice action against Dr. Peter Moulder and Tulane University Medical Center (TUMC) on an exception of prescription. We affirm.
On November 20, 1986,plaintiff, an ambulance driver, severely injured himself while lifting a paraplegic from a wheelchair. He initially went to his family physician who prescribed pain medication and muscle relaxers. Shortly thereafter, he sought the help of an orthopedist, Dr. William Pusateri. Dr. Pusateri treated plaintiff for several months but in June 1987 referred him to Dr. Thomas Whitecloud at TUMC after plaintiff continued to complain of lower back pain. Dr. Whitecloud also treated plaintiff for a brief period and in August 1987 referred him to Dr. Peter Moulder, a thoracic surgeon at TUMC.
After examining plaintiff and obtaining his medical history, Dr. Moulder determined that he sustained a thoracospinal avulsion, a rare, painful injury where the rib cage separated from the vertebral column. Dr. Moulder recommended that plaintiff undergo surgery.
kOn February 2, 1988, plaintiff entered TUMC. At that time, Dr. Moulder met with Dr. Whitecloud, plaintiff and his wife, Noelie, and explained that the operation was the only procedure that could possibly relieve plaintiffs pain. Following this meeting, plaintiff agreed to undergo the surgery and signed the consent form on February 4,1988.
The following day, February 5, 1988, Dr. Moulder operated on plaintiff, performing a thoracic stabilization of T3-T9 vertebrae with a posterior bi-thoracic, bi-eostal vertebral immobilization with Parham bands and steel wires. Plaintiff underwent the surgery and post-operative treatment with no complications.
On March 14,1988,plaintiff returned to the emergency room at TUMC with a wound seroma. Dr. Moulder drained the wound and discharged plaintiff four days later with instructions to wear a back brace, not to engage in strenuous activity, and to take Percocet for pain. Plaintiff saw Dr. Moulder again on March 27 and March 31, 1988, for suture removal, wound cleanings and pressure applications. From this period until July 1988, plaintiffs condition improved and his pain subsided.
On July 25, 1988,plaintiff hurt his back while dancing on a dance floor when someone struck him. At that time, plaintiff returned to TUMC complaining of severe pain in his back and shoulders. Chest x-rays indicated the presence of a “wire wrap” along the *538 thoracic spine and posterior ribs. After a physical examination, Dr. Moulder diagnosed plaintiff with a contusion. Two weeks later, on August 9, 1988, plaintiff went to see Dr. Moulder again complaining of pain ¡¡between his shoulders. Dr. Moulder prescribed Dar-vocet, Percodan and Prednisone. .
On September 20, 1988, plaintiff returned to Dr. Moulder complaining of chronic pain. From this time through June 1992,plaintiff frequently returned to the surgery clinic at TUMC with complaints of varying degrees of pain. For treatment Dr. Moulder injected plaintiff with Marcaine and Arisocort and continued to prescribe various pain medications. During plaintiffs visit on November 10, 1990, Dr. Moulder made a pocketsize copy of an x-ray for plaintiff to have to facilitate his passing through security gates at the airport, as the wires in his back set off the metal detectors. The miniature x-ray contained the following note from Dr. Moulder: “Mr. Morgan has a large amount of metal in his back which may turn on metal detectors.”
Meanwhile, plaintiff continued to take the prescribed pain relievers and, as a result, developed stomach ulcers and an addiction to the narcotic medication. In 1991, Dr. Moulder and Dr. Leon Weisberg, a neurologist at TUMC, recommended that plaintiff enter a detoxification program for his drug dependency. Plaintiff last saw Dr. Moulder at TUMC on June 12, 1992. During this visit he stated that he was dissatisfied with the treatment and would never again return to TUMC. Although Dr. Moulder no longer saw plaintiff, he continued to prescribe the pain medication through February 1993.
On September 22, 1992, plaintiff went to see Dr. Stephen Kishner at Gulf States Rehabilitation Associates for an initial evaluation. After learning of the rare ^surgery plaintiff had undergone and noting the condition of his back, Dr. Kishner recommended that plaintiff see Dr. Mitchel Harris, an orthopedist at LSU Medical. Center. Dr. Harris examined plaintiff on November 3, 1992, and informed him that he could not remove the hardware because of its location to plaintiffs major organs but would consider cutting two protruding wires. Dr. Harris also referred plaintiff to Dr. Claude Craighead for another opinion. Like Dr. Harris, Dr. Craig-head concluded that most of the hardware could not be removed without risk to plaintiffs life. In January 1993, after plaintiff consented to undergo surgery, Dr. Craighead operated on him, removing some of the wires and bands.
Plaintiff filed a medical malpractice complaint with the Patients’ Compensation Fund against Dr. Moulder on October 25, 1993, alleging lack of informed consent for the February 5,1988 surgical procedure. Specifically, he alleged that Dr. Moulder knowingly withheld information from him concerning the nature of the operation and intentionally made untrue statements to induce him to consent to an unsafe, experimental operation. Additionally, plaintiff alleged that Dr. Moulder inappropriately prescribed narcotic pain relievers knowing that plaintiff would become addicted to the medication.
The defendants filed an exception of prescription, arguing that plaintiffs cause of, action had prescribed under La.Rev.Stat. 9:5628, because suit was filed more than three years after the date of surgery. In sustaining defendants’ exception, the trial judge made the following findings as set forth in his written reasons for judgment:
feThe three year period under R.S. 9:5628 expired on 5 February 1991, three years after the surgery. The one year period under R.S. 9:5628 (although more than 3 years after the surgery, but ignoring for purposes of this opinion that 3 years time frame) expired on 11 November 1991, one year after Morgan received the miniature x-ray which gave Morgan the clearest pictorial knowledge about extensive wires and bands in his back; a reasonable person would have to know that part of his pain was related to the surgery. The one year period may run earlier, but regardless it predated by more than one year the 25 October 1993 PCF filing.
No evidence in this case establishes that Moulder intended to cause Morgan any injury or intended to conceal the existence of the wires and bands in Morgan’s back. In this case, there is a want of an indication of concealment, of misrepresentation *539 as to what was actually done to Morgan, of fraud, or of ill practice. The continual supply of medicine for pain and the performance of procedures on Morgan by Moulder do not show that the third category of contra non valentem applies.
In conclusion, this court has been unable to find a theory of law that shows that this case has not prescribed.
Ordinarily, the party pleading the exception bears the burden of proof. Niklaus v. Bellina, 96-2411 (La.App. 4 Cir. 5/21/97), 696 So.2d 120, 122, writ denied, 97-2118 (La.11/14/97), 703 So.2d 631. However, where the face of the petition shows prescription has run, the burden of proof shifts to the plaintiff to show prescription has not run. Lima v. Schmidt, 595 So.2d 624 (La.1992); Niklaus, supra. Generally, when a claim is filed more that one year after the alleged act of omission or neglect, it is prescribed on its face. See, e.g., Rizer v. American Sur. and Fidelity Ins. Co., 95-1200 (La.3/11/96), 669 So.2d 387.
In the instant case,plaintiff filed his medical malpractice complaint on October 25, 1993, alleging damages as a result of surgery performed on Febraury 5, 1988. Clearly, on the face of the petition, plaintiffs claim had prescribed. In view of this, plaintiff had the burden of proving that the cause of action had not prescribed.
^Prescription in a medical malpractice action is controlled by La.Rev.Stat. 9:5628, which provides:
A. No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist, psychologist, optometrist, hospital duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years, from the date of the alleged act, or neglect.
Prescription commences and continues when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person, that he or she is a victim of a tort. Griffin v. Kinberger, 507 So.2d 821 (La.1987). The test for determining sufficient knowledge is:
[W]hether the cause of action was known or reasonably ‘knowable’ by plaintiff. ...When a plaintiff has knowledge of facts strongly suggestive that the untoward condition or result may be the result of improper treatment and there is no effort by the health care providers to mislead or cover up information which is available to plaintiff through inquiry or professional medical or legal advice, then the facts and cause of action are reasonably knowable to plaintiff.
Gore v. Snider, 590 So.2d 677, 680 (La.App. 3 Cir.1991) [quoting Harlan v. Roberts, 565 So.2d 482, 486 (La.App. 2 Cir.1990), writ denied, 567 So.2d 1126 (La.1990) ]. It is not necessary that a doctor or a lawyer tell the plaintiff that he or she has a medical malpractice claim before prescription begins to run; rather, a court may find that a plaintiff had knowledge of the existence of a medical malpractice cause of action based on plaintiffs background, intelligence, response [to symptoms, and other relevant circumstances. Claim of Aron, 96-2665 (La.App. 4 Cir. 5/21/97), 695 So.2d 553.
On appeal, plaintiff argues that the trial judge erred in holding that his cause of action had prescribed under La. R.S. 9:5628. He contends that the earliest prescription began to run was November 1992, when he saw Dr. Mitchel Harris at LSUMC and for the first time suspected that the operation Dr. Moulder had performed was improper. He also argues that Dr. Moulder’s continual treatment of him through February 1993 suspended the running of prescription, citing Trainor v. Young, 561 So.2d 722 (La.App. 2 Cir.1990), writ denied, 567 So.2d 1124 (La.1990) [the basis for interrupting prescription is the premise that the professional relation *540 ship is likely to hinder the patient’s inclination to sue]
Plaintiff alleges that he did not give his informed consent for the surgery performed on February 5,1988. However, the evidence in the record discloses that on February 4, 1988, he signed a hospital consent form which stated that purpose of the surgery was to “repair the displaced portion of the vertebrae and or ribs in the back which are causing the persistent back pain,” and that there was “no guarantee as to the result of the surgery or as to cure.” Notwithstanding this signed consent form, plaintiff testified at the hearing that he thought the operation was to repair a muscle, but conceded that Drs. Moulder and Whitecloud told him that they could not guarantee the surgery would relieve all or any of the pain.
Plaintiff also testified that the surgery alleviated some of his pain. According to him, he could lie down, mow the lawn and dance. He first experienced severe pain following the surgery in July 1988 when someone bumped into him on the dance floor. After this unfortunate incident, plaintiff visited Dr. Moulder regularly from 1988 through 1992 at TUMC for treatment. Plaintiffsj^ain management entailed Dr. Moulder’s injecting him in the back with Lignocaine, Marcaine and Aristocort. Dr. Moulder also prescribed Darvoeet, Percodan, Flexeril and Prednisone for pain.
The evidence in the record discloses that plaintiff was aware of the wires and bands in his back as early as March 14, 1988, the month after surgery when he went to the emergency room for the wound seroma and told the nurse that his “rib cage was wired.” Nonetheless, plaintiff testified that Dr. Moulder produced a miniature x-ray of his back in November 1990, which revealed the wire and bands. Plaintiff kept the pocket-size x-ray with him to facilitate his passing through security gates at the airport. At the hearing, plaintiff submitted the x-ray, which contained Dr. Moulder’s signature and phone number at TUMC. Again, in September 1992, Dr. Kishner took x-rays of plaintiffs back, which also revealed the hardware.
The medical records in evidence show that Dr. Moulder last treated plaintiff in an office visit at TUMC on June 2, 1992, although he continued to prescribe pain medication for him through February 1993. They further disclose that plaintiff was fully aware that he had adverse reactions to the pain medication as early as Septmber 1989 when he was diagnosed with stomach ulcers. According to plaintiff, at the time he was taking 200 Perco-dan tablets a month and believed Dr. Moulder was inappropriately prescribing medicine for him. He also testified that in April 1991 he knew he was chemically dependent and met with Drs. Moulder and Weisberg who recommended that he enter a detoxification program. In addition, on July 17, 1991, Dr. Moulder tried to get plaintiff to agree to enter a detoxification program, but plaintiff refused, telling him that he could “detox” on his own. Plaintiff also admitted that Dr. Moulder switched his medications several (■/times and even prescribed methadone in an attempt to wean him off the prescriptive pain killers.
In Claim of Aron, supra, we rejected the idea that a patient had to be informed by a physician of possible malpractice before prescription begins to run. In that case, the plaintiff underwent two surgical procedures, on May 29, 1991, and May 31, 1991. After recovery, she complained of facial weakness, double vision, tinnitus and right-sided neurological deficits related to the surgery. On June 2, 1995, the plaintiff filed a complaint with the Patients’ Compensation Fund. Defendants filed an exception of prescription and argued that prescription began to run on the date of surgery, May 29, 1991. The plaintiff maintained that prescription began to run on August 17, 1994, the date her physician reviewed her hospital records and specifically stated that the surgery was performed improperly and, because the suit was filed within one year of that date, it was timely. In affirming the trial court’s judgment sustaining the exception of prescription, we noted that following surgery, recovery and rehabilitation, the plaintiff sought treatment for the neurological deficits. In March of 1992, a physician reviewed her record and opined that the surgeries left her with some residual deficits. Again, in October 1993 and August 1994, two other physi- *541 eians concluded the same. We held that the plaintiff had sufficient information to excite attention and prompt further inquiry such-that prescription began to run right after the surgery.
After reviewing the record, we find the evidence supports the trial judge’s conclusions that the three-year prescriptive period under La. R.S. 9:5628 commenced running on the date of plaintiffs surgery, February 5, 1988. Also, based on our review of the evidence we cannot say the trial judge was clearly wrong or erred in holding that the one-year prescriptive period under the statute hoexpired on November 11,1991, one year after plaintiff received the miniature x-ray. Contrary to plaintiffs assertion, the testimony in the record discloses that plaintiff was fully aware that his pain was directly related to the surgery and knew of the existence of the bands and wires in his back prior to seeing Dr. Harris at LSUMC in November of 1992.
Though not specifically addressed by the trial court in its reasons for judgment, any cause of action plaintiff may have had against the defendants for negligently prescribing pain medicine resulting in his drug addiction commenced running no later than April 1991, the date plaintiff acknowledged his drug dependency and Drs. Moulder and Weisberg recommended that he enter a drug detoxification program.
• Plaintiff, nontheless, argues that the doctrine of contra non valentón agere nulla currit praescripto is applicable to this case and suspends the prescriptive toll of La.Rev. Stat. 9:5628. He contends that in addition to the lack of informed consent, Dr. Moulder intentionally misrepresented the nature of the surgery, his familiarity with the procedure and the risks it involved.
Under the doctrine of contra non va-lentón, courts dispense with prescription in the interests of justice under special circumstances. See La. Civ.Code art. 3467 comment (d). The Louisiana Supreme Court set forth four exceptional circumstances in which prescription should be suspended. See Corsey v. State, Through Dept. of Corrections, 375 So.2d 1319 (La.1979). The third and fourth circumstances are relevant to the present case and provide: (3) Where the debtor himself has done some act effectively to prevent the creditor from availing himself of his cause of action; and (4) Where the cause of action is not known or ^reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. Id. at 1321-22.
The Louisiana Supreme Court, however, has previously decided that the “discovery rule” embodied in the fourth contra non valentón exception does not apply to suspend prescription when three years have passed between the act, omission, or neglect giving rise to the medical malpractice action and the filing of suit. Rajnowski v. St. Patrick’s Hospital, 564 So.2d 671 (La.1990); Crier v. Whitecloud, 496 So.2d 305, 307 (La.1986); Chaney v. State Through the Dept. of Health and Human Resources, 432 So.2d 256 (La.1983). See also Whitnell v. Silverman, 95-0112 (La.12/6/96), 686 So.2d 23, 32 n. 3 (Lemmon, J., dissenting). Because plaintiff filed his suit more than three years after the act of malpractice, the trial judge was correct in concluding that the discovery rule, as a matter of law, cannot be used to save plaintiffs cause of action.
Although the Louisiana Supreme Court has often failed to declare whether the third contra non valentem exception applies, as it indicated in Rajnowski, supra, a physician’s conduct must rise to the level of concealment, misrepresentation, fraud, or ill practice under this exception. See also Fontenot v. ABC Ins. Co., 95-1707 (La.6/7/96), 674 So.2d 960, 964.
Plaintiff argues on appeal that Dr. Moulder concealed the fact that the surgery was experimental and would most likely be of no benefit to him. He contends that he first obtained this information when Dr. Craig-head examined him in November 1992 at the urging of Dr. Harris. In support of his argument, plaintiff refers to the testimony of his expert, Dr. Jerry R. Kelly, a thoracic surgeon. Dr. Kelly testified in deposition that he knew of no such diagnosis of “thoracic avulsion syndrome” and opined that it was unlikely that the operation would have |[2been *542 successful in relieving plaintiffs pain and Dr. Moulder should have advised plaintiff of this.
After reviewing the record, we cannot say the trial judge was clearly wrong in agreeing with Dr. Kelly that “it is unlikely Morgan truly understood what the surgery would entail” and that “it is more likely than not that the details of the surgery were not explained to Morgan.” Notwithstanding Dr. Kelly’s testimony, however* there is no evidence to support a claim of fraud, concealment, misrepresentation or ill practice. Dr. Moulder testified that he explained the surgical procedure to plaintiff, told him of the possible risks and did not guarantee that the operation would relieve his pain. The surgical procedure and possible risks were fully described in plaintiff’s medical records, which were available to him at all times. Assuming, arguendo, that the third category of contra non valentem does apply, we agree with the trial court that there are no facts or circumstances in the record to suggest that Dr. Moulder or TUMC’s conduct rose to the level of concealment, misrepresentation, fraud or ill practice.
For the foregoing reasons, we affirm the judgment of the trial court sustaining defendants’ exception of prescription and dismissing plaintiffs suit.
AFFIRMED.